1    JASON M. FRIERSON
     United States Attorney
2    District of Nevada
     Nevada Bar Number 7709
3    DANIEL J. COWHIG
     Assistant United States Attorney
4    501 Las Vegas Blvd. South, Suite 1100
     Las Vegas, Nevada 89101
5    (702) 388-6336
     daniel.cowhig@usdoj.gov
6    *Attorneys for the United States of America*

**FILED**

JUN 2 4 2024

U.S. MAGISTRATE JUDGE

BY _____

7

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

8

| | |
|---|---|
| 9   UNITED STATES OF AMERICA, | Case No. 2:24-MJ- 557 -MDC |
| 10      Plaintiff, | **COMPLAINT** for violations of: |
| 11    vs. | <u>Count One</u>: 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D) – Manufacturing and Dealing in Firearms Without a License |
| 12   ANTHONY GEORGE HOLLIS,<br>     also known as "Ant," | |
| 13 | |
| 14      Defendant. | <u>Counts Two, Three, Four and Five</u>: 18 U.S.C. § 922(o) – Illegal Possession and Transfer of Machine Guns |
| 15 | |
| 16 | <u>Count Six</u>: 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) – Possession of a Controlled Substance with Intent to Distribute (Methamphetamine) |
| 17 | |
| 18 | |
| 19 | |

20        BEFORE the Honorable Maximiliano D. Couvillier, III, United States Magistrate

21   Judge, Las Vegas, Nevada, the undersigned Complainant, being duly sworn, deposes and

22   states:

23

24

1

COUNT ONE
Manufacturing and Dealing in Firearms Without a License
18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D)

2

3      Between on or about May 1, 2024, and on or about May 24, 2024, in the State and

4  Federal District of Nevada and elsewhere,

5

ANTHONY GEORGE HOLLIS,
a.k.a. "Ant,"

6

7  defendant herein, not being a licensed dealer of firearms within the meaning of Chapter 44,

8  Title 18, United States Code, did willfully engage in the business of manufacturing and dealing

9  in firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A), 923(a), and

10  924(a)(1)(D).

11

COUNT TWO
Illegal Possession and Transfer of a Machine Gun
18 U.S.C. § 922(o)

12

13      On or about May 1, 2024, in the State and Federal District of Nevada,

14

ANTHONY GEORGE HOLLIS,
a.k.a. "Ant,"

15

16  defendant herein, did knowingly possess and transfer a machine gun, that is: a machine gun

17  conversion device used to modify a Glock-pattern semiautomatic firearm to fire as a fully

18  automatic weapon, enabling said firearm to automatically shoot more than one shot, without

19  manual reloading, by a single function of the trigger, all in violation of Title 18, United States

20  Code, Sections 922(o) and 924(a)(2).

21

22

23

24

1

## COUNT THREE
Illegal Possession and Transfer of Machine Guns
18 U.S.C. § 922(o)

2

3    On or about May 8, 2024, in the State and Federal District of Nevada,

4    ANTHONY GEORGE HOLLIS,
a.k.a. "Ant,"

5

6    defendant herein, did knowingly possess and transfer five machine guns, that is: machine gun

7    conversion devices used to modify Glock-pattern semiautomatic firearms to fire as a fully

8    automatic weapon, enabling said firearm to automatically shoot more than one shot, without

9    manual reloading, by a single function of the trigger, all in violation of Title 18, United States

10   Code, Sections 922(o) and 924(a)(2).

11   ## COUNT FOUR
Illegal Possession and Transfer of a Machine Gun
18 U.S.C. § 922(o)

12

13   On or about May 9, 2024, in the State and Federal District of Nevada,

14   ANTHONY GEORGE HOLLIS,
a.k.a. "Ant,"

15

16   defendant herein, did knowingly possess and transfer a machine gun, that is: a machine gun

17   conversion device used to modify a Glock-pattern semiautomatic firearm to fire as a fully

18   automatic weapon, enabling said firearm to automatically shoot more than one shot, without

19   manual reloading, by a single function of the trigger, all in violation of Title 18, United States

20   Code, Sections 922(o) and 924(a)(2).

21

22

23

24

1

<u>COUNT FIVE</u>
Illegal Possession and Transfer of Machine Guns
18 U.S.C. § 922(o)

2

3          On or about May 24, 2024, in the State and Federal District of Nevada,

4                          ANTHONY GEORGE HOLLIS,
                               a.k.a. "Ant,"

5

6    defendant herein, did knowingly possess and transfer three machine guns, that is: machine gun

7    conversion devices used to modify Armalite-15-pattern semiautomatic firearms to fire as a fully

8    automatic weapon, enabling said firearm to automatically shoot more than one shot, without

9    manual reloading, by a single function of the trigger, all in violation of Title 18, United States

10   Code, Sections 922(o) and 924(a)(2).

11

<u>COUNT SIX</u>
Possession of a Controlled Substance with Intent to Distribute (Methamphetamine)
21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii)

12

13         On or about May 13, 2024, in the State and Federal District of Nevada,

14                         ANTHONY GEORGE HOLLIS,
                               a.k.a. "Ant,"

15

16   defendant herein, did knowingly and intentionally possess with intent to distribute 50 grams or

17   more of a mixture or substance containing a detectable amount of methamphetamine, a

18   Schedule II controlled substance, in violation of Title 21, United States Code, Section

19   841(a)(1) and (b)(1)(B)(viii).

20

21

22

23

24

PROBABLE CAUSE AFFIDAVIT

1.      Your Complainant, Robert Raybould, Special Agent (SA), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), a states the following as and for probable cause:

2.      Your Complainant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). As such, your Complainant is "an investigator or officer charged by the Attorney General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States," within the meaning of Section 3051(a) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, execute warrants and to make arrests for offenses against the United States. Your Complainant has been so employed since December 2021.

3.      Your Complainant is currently assigned to the ATF Las Vegas Group II. Your Complainant is a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and Special Agent Basic Training at the ATF National Academy. The training that your Complainant received at the academy totaled over 1,000 hours of education and experience on various topics including formalized instruction in, among other things: firearms, drugs, and violent crime-related investigations, familiarization with United States firearms laws, financial investigations and money laundering, identification and seizure of drug and firearms tracking related assets, physical and electronic surveillance, weapon qualification and tactics, operation and use of confidential sources, and undercover operations.

4.      As an ATF Special Agent, your Complainant has conducted and participated in both state and federal investigations involving the illegal possession and trafficking of firearms. During these investigations, your Complainant has participated in and/or served as the primary case agent in cases involving various types of investigative techniques, including the use of electronic surveillance, assistance from undercover agents and informants, and the controlled

1   purchases of firearms and narcotics from suspects. Your Complainant has also conducted

2   physical surveillance operations and has experience in recognizing tactics employed by targets of

3   investigations to thwart law enforcement surveillance. Your Complainant has executed

4   numerous federal and state arrest warrants and search warrants, resulting in the successful

5   prosecution of defendants. Your Complainant works with informants and cooperators which

6   has involved, among other things, monitoring meetings and recorded conversations, and

7   generally evaluating the reliability and truthfulness of an informant or cooperator.

8          5.      Additionally, your Complainant has authored numerous search warrants for

9   residences, vehicles, electronic devices, tracking devices, and social media accounts. Because of

10  your Complainant's training and experience, your Complainant is familiar with the manner in

11  which illegal firearm and drug traffickers smuggle, transport, store, conceal, and distribute

12  firearms and drugs, as well as how they collect and launder proceeds related to such activities.

13  Your Complainant is also familiar with the manner in which these individuals use telephones,

14  coded communications, false or fictitious identities, and other means to facilitate illegal activities

15  and thwart law enforcement investigations. Your Complainant has also consulted and discussed

16  these investigations with other law enforcement officers and agents who are experienced in these

17  types of investigations.

18         6.      Prior to your Complainant's employment as an ATF Special Agent, your

19  Complainant served over fourteen years as a sworn peace officer within the State of Utah at the

20  St George Police Department between August 2007 and November 2021. Your Complainant

21  graduated from the Utah Peace Officer Standards and Training Academy (POST) after receiving

22  approximately 600 hours of formalized instruction pertaining to the investigation and

23  enforcement of laws within the State of Utah. During your Complainant's time as a St George

24  Police Officer and Detective, your Complainant investigated numerous types of crimes including

6

1  aggravated and simple assaults, homicides, residential and commercial burglaries, possession

2  and distribution of narcotics and controlled substances, gang related crimes, illegal firearm

3  possession as well as other firearm related investigations. In addition to the training and

4  education provided by Utah POST your Complainant attended an additional 1,000 hour of

5  training and education related to interview and interrogation techniques, money laundering,

6  gangs and gang history, human trafficking, firearm trafficking, crime scene documentation and

7  investigation, undercover operations, physical and electronic surveillance, and the operation and

8  use of confidential sources.

9      7.    The following is the result of your Complainant's investigation or was provided

10  by other law enforcement officers. The following factual statement is a brief summary of the

11  information that your Complainant has gained from his personal involvement in the

12  investigation and from various intelligence sources currently available with respect to this

13  investigation.  Unless otherwise noted, if your Complainant asserts that a statement was made,

14  the information was provided by an ATF Special Agent, LVMPD Detective, or another law

15  enforcement officers (who may have had either direct or hearsay knowledge of the statement) to

16  whom your Complainant has spoken to or whose reports the Complainant has reviewed. Also,

17  this affidavit is being submitted for the limited purpose of seeking authorization for a search

18  warrant.  While your Complainant has participated in the below described investigation, your

19  Complainant has not provided every fact known to him within this Complaint. Rather, your

20  Complainant has included only those facts necessary to establish probable cause. All times

21  contained herein are approximate.

22

23

24

7

FACTS ESTABLISHING PROBABLE CAUSE

8.      An investigation by the ATF Las Vegas Field Office determined that between on or about May 1, 2024 and May 24, 2024, Anthony George Hollis, who uses the moniker "Ant,"

a.      not being a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, did willfully engage in the business of manufacturing and dealing in firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A), 923(a), and 924(a)(1)(D);

b.      did knowingly possess and transfer ten (10) machine guns, that is: a machine gun conversion devices used to modify semiautomatic firearms to fire as fully automatic weapons, enabling such firearms to automatically shoot more than one shot, without manual reloading, by a single function of the trigger, all in violation of Title 18, United States Code, Sections 922(o) and 924(a)(2), and;

c.      knowingly and intentionally possessed with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

9.      In April 2024, a person reported to be trading in firearms in or near Las Vegas, Nevada, provided ATF CI#27555, hereinafter referred to as Confidential Informant #1 (CI#1[1]), a phone number for another person whom he told CI#1 was distributing firearms in the Las Vegas, Nevada area and potentially manufacturing Machine-gun Conversion Devices.

---

[1] CI#1 has been a Confidential Informant for the ATF for approximately three years and has also received pecuniary payments for his assistance. CI#1's information has proven reliable in the past on several investigations. All information provided by CI#1 is corroborated by law enforcement investigators. CI#1 signed cooperation agreement and pleaded guilty to one count of Conspiracy to Make a False Statement in Acquisition of a Firearm and one count of

1      10.     A Machine-gun Conversion Device (MCD) is a device that converts a

2  semiautomatic firearm – pistol, rifle, or shotgun – into a fully automatic machine gun. A

3  machine gun is a "weapon which shoots, is designed to shoot, or can be readily restored to

4  shoot, automatically more than one shot, without manual reloading, by a single function of the

5  trigger." 26 U.S.C. § 5845(b). Because the statutory definition of a machine gun includes "any

6  part designed and intended solely and exclusively, or combination of parts designed and

7  intended, for use in converting a weapon into a machinegun," *id*, an MCD by itself is also a

8  machine gun under the law.

9      11.     CI#1 called the telephone number he had been given, XXX-XXX-3530,

10  hereinafter referred to as "TARGET TELEPHONE" or "TT," and reached a male using TT

11  who identified himself as "Ant." During that call, CI#1 and "Ant" discussed the sale and

12  purchase of firearms and MCDs.

13      12.     Your Complainant researched TT using law enforcement databases to further

14  identify "Ant." In March 2024, a person who identified himself as Anthony G. HOLLIS,

15  hereinafter referred to as "HOLLIS," had provided TT as a current contact phone number in a

16  report filed with the Las Vegas Metropolitan Police Department (LVMPD) claiming ownership

17  of a firearm seized during a separate LVMPD investigation.

18      13.     Cross-referencing the information from the LVMPD report and with other law

19  enforcement, government and commercial databases, your Complainant determined that

20

21

---

22  Conspiracy to Distribute a Controlled Substance in an unrelated investigation. CI#1 is working
    for consideration of his charges. Additionally, CI#1 has several arrests for narcotic related
23  offenses, driving violations, probation violations, felon in possession of firearm, and stolen
    property offenses. CI#1 was convicted in 2009 for attempt possession of a firearm by felon and
24  in 2004 for two counts of trafficking a controlled substance.

1    Anthony G. HOLLIS using TT was born on April 22, 1997, and reportedly lived at 7717

2    Sedalia Street, Las Vegas, Nevada.

3                        **a.  May 1, 2024, Transfer of a Glock Switch MCD**

4             14.     On or about May 1, 2024, CI#1 and "Ant" met in person at a park near Durango

5    Station in Las Vegas, Nevada. "Ant" drove a 2017 Mitsubishi Mirage bearing Nevada license

6    plate of 289PCZ, hereinafter referred to a "SUBJECT VEHICLE 1." During the meeting,

7    "Ant" showed CI#1 two firearms, one AK-pattern rifle and one Glock-pattern pistol, and two

8    unfinished firearm lower receivers (lowers), which Ant retrieved from SUBJECT VEHICLE 1.

9    "Ant" told CI#1 that he printed MCDs locally. As "Ant" and CI#1 discussed future firearm

10   and MCD sales, "Ant" gave CI#1 a "Glock switch" type MCD at no cost. A Glock switch is a

11   type of MCD specifically designed to convert a semiautomatic Glock pistol to a fully automatic

12   machine gun. ATF agents took possession of the Glock switch MCD on May 2, 2024. The

13   Glock switch MCD appeared to be 3D-printed.

14           15.     Law enforcement agents showed CI#1 a photo of HOLLIS investigators had

15   obtained from the Nevada Driver License record associated with HOLLIS. CI#1 identified

16   HOLLIS as "Ant," the individual CI#1 had met with at the park and who had provided CI#1

17   with the MCD.

18           16.     Your Complainant queried the Federal Licensing System (FLS) and found

19   HOLLIS does not, nor has he ever had a Federal Firearms License (FFL) issued to him to

20   manufacture, produce, build, transfer, or sale any firearms, including MCDs.

21           17.     Your Complainant queried the National Firearms Registry and Transfer Records

22   (NFRTR) and found HOLLIS does not, nor has he ever had any firearms, including but not

23   limited to firearms regulated by the National Firearms Act such as machine guns, MCDs, or

24

1   short-barrel rifles, registered to him, nor had HOLLIS made any applications to have any

2   firearms, including but not limited to the above NFA regulated items, registered to him.

3          18.     At the direction of ATF, CI#1 continued to talk with HOLLIS between May 1,

4   2024, and May 8, 2024, contacting HOLLIS on TT. HOLLIS told CI#1 that HOLLIS would

5   potentially have five Glock switch MCDs and two firearms for sale. HOLLIS described the

6   firearms as the AK-pattern rifle he had shown to CI#1 at the park near Durango Station on or

7   about May 1, 2024, and a gold-colored Glock style pistol which HOLLIS told CI#1 was in

8   LVMPD custody. The description of the Clock style pistol matched the firearm your

9   Complainant found to be in LVMPD custody for which HOLLIS had claimed ownership in

10  March 2024.

11  **b. May 8, 2024, Controlled Purchase of an AK-Pattern Rifle and Five Glock Switch MCDs**

12         19.     On May 8, 2024, ATF, LVMPD, and NLVPD personnel conducted a controlled

13  purchase operation involving CI#1 and CI#26813, hereinafter referred to as CI#2[2], of a

14  Century Arms International model Tantal Sporter 5.45x39mm AK-74-pattern style rifle bearing

15  serial number TTL00496 and five Glock switch MCDs from HOLLIS.

16         20.     Before the scheduled time of the controlled purchase, plainclothes law

17  enforcement personnel using unmarked vehicles established surveillance around the address

18  listed on HOLLIS' Nevada Driver License, that is, 7717 Sedalia Street, Las Vegas, Nevada.

19  Surveillance units noted SUBJECT VEHICLE 1 was not visible near 7717 Sedalia Street.

20

21  ─────────────────

22         [2] CI#2 is a convicted felon. CI#2 has a conviction for a crime of dishonesty, specifically
    possession of stolen vehicle, in 2000. CI#2 has worked as an informant for the ATF for

23  approximately six (6) years. CI#2 works as a CI for monetary gain. CI#2 has provided
    information which has resulted in the seizure of multiple pounds of illegal narcotics, dozens of

24  firearms, and has successfully introduced Undercover Agents ("UCA") to further large multi-
    defendant investigations to include federal judicially approved wiretaps.

21.     In a call monitored and recorded by ATF agents, CI#1 called TT. CI#1 provided directions to the Durango Casino & Resort located at or near 6915 S Durango Drive, Las Vegas, Nevada, where CI#1 and CI#2 were waiting for HOLLIS. HOLLIS arrived at the Durango Casino & Resort in a 2018 Chevrolet Sonic bearing Nevada license plate 288V51, hereinafter referred to a "SUBJECT VEHICLE 2." Law enforcement surveillance units in the area of 7717 Sedalia Street did not see HOLLIS exit 7717 Sedalia Street, nor did they see SUBJECT VEHICLE 2 leave the area of 7717 Sedalia Street.

22.     HOLLIS provided CI#2 with a Century Arms International model Tantal Sporter 5.45x39mm AK-74-pattern style semiautomatic rifle bearing serial number TTL00496 and five large-capacity magazines, four of which were brand new in unbroken packing. HOLLIS also provided CI#2 with a Zyn nicotine pouch canister that contained 3D-printed Glock switch MCD "legs." The "leg" is the piece of the Glock switch MCD that extends into the Glock-pattern pistol to depress the trigger bar, causing the pistol to fire continuously at an extremely high rate of fire until the shooter releases the trigger or all ammunition in the pistol is expended. HOLLIS told CI#1 and CI#2 that he left the rest of the Glock switch MCDs – the other parts – in his other vehicle. Telling CI#1 and CI#2 to wait, HOLLIS left the Durango Casino & Resort in SUBJECT VEHICLE 2. Unmarked law enforcement surveillance units followed HOLLIS to a residence at 9794 Villa Lorena, Las Vegas, Nevada, 89147, hereinafter referred to as "SUBJECT RESIDENCE," where law enforcement personnel saw the garage door open. HOLLIS got out of SUBJECT VEHICLE 2 and entered the residence through the garage. After several minutes, HOLLIS exited the residence and got back into SUBJECT VEHICLE 2. Unmarked law enforcement surveillance units followed HOLLIS as he returned to Durango Casino & Resort in SUBJECT VEHICLE 2.

23.     After returning to the Durango Casino & Resort, HOLLIS provided CI#2 with five Glock switch MCD "backplates," sometimes referred to as "bodies," that appeared to be 3D-printed and a container with metal nuts and bolts. HOLLIS explained the metal nuts and bolts were the Glock switch MCD selector switches. HOLLIS described how to assemble the MCDs, then showed CI#1 and CI#2 how to assemble the various pieces – backplate, leg, and metal nut and bolt – complete a Glock switch MCD. HOLLIS then disassembled the Glock switch MCD, explaining to CI#1 and CI#2 that he keeps the parts separated while he is driving around in case he needs to discard the items in during an encounter with law enforcement.

24.     CI#2 paid HOLLIS a total of $1300 in previously recorded U.S. currency, $800 for the Century International Arms AK-74-pattern rifle and magazines and $500 for the five Glock switch MCDs.

25.     CI#2 asked HOLLIS to exchange telephone numbers. HOLLIS produced a cellular telephone from his person, appeared to unlock the device with a passcode, and gave the cell phone to CI#2. Using the cell phone handed to him by HOLLIS, CI#2 called CI#2's cell phone, which was monitored and recorded by ATF agents. The phone number that rang on CI#2's cell phone was TT.

26.     HOLLIS showed CI#1 and CI#2 two unfinished firearm lower receivers HOLLIS had in his backpack. HOLLIS told CI#1 and CI#2 he would acquire parts and accessories needed to make the unfinished lower receivers into complete firearms for a future sale. CI#1 and CI#2 both told HOLLIS that because they had served time in prison they could not lawfully acquire firearms, they were interested in acquiring additional firearms from HOLLIS.

27.     Law enforcement issued an administrative subpoena to NV Energy seeking information on any account in the name of HOLLIS and any account serving SUBJECT

13

1   RESIDENCE. NV Energy returned records indicating that NV Energy had no record of a

2   current account in the name of Anthony George HOLLIS, but did have record of an inactive

3   account in the name of Anthony George HOLLIS with prior service at a third address – neither

4   7717 Sedalia Street nor 9794 Villa Lorena (SUBJECT RESIDENCE) – but service at that third

5   address had been discontinued in 2023. NV Energy records for that inactive account matched

6   the date of birth and social security number of HOLLIS' DMV record and TT was listed as a

7   means of contact. NV Energy records showed that 9794 Villa Lorena (SUBJECT

8   RESIDENCE) was served by a current account in the name of Rocky Hollis, giving a date of

9   birth in 1976. Clark County Tax Assessor records show that 9794 Villa Lorena (SUBJECT

10   RESIDENCE) was recorded in September of 2023 to a Rocky B Hollis. NV Energy records

11   indicated that account had been active at SUBJECT RESIDENCE in the name of Rocky

12   Hollis.

13       28.    Between May 8 and May 9, 2024, HOLLIS, using TT, exchanged text messages

14   and phone calls with CI#2, who was using a monitored and recorded cell phone provided by

15   ATF. HOLLIS told CI#2 that he was acquiring parts and accessories to complete the assembly

16   of various Personally Made Firearms (PMFs) to sell. HOLLIS also offered to CI#2 that he

17   could contact a person who had a metal Glock switch MCD for sale. HOLLIS told CI#2 that

18   he would bring the metal Glock switch MCD and three firearms to CI#2 on May 9, 2024.

19              **c.  May 9, 2024, Controlled Purchase of a Palmetto State Armory**
              **Glock-Pattern Pistol, a PMF Fabrique Nationale-Pattern Pistol, a**

20              **PMF Armalite-pattern Rifle, and a Metal Glock Switch MCD**

21       29.    On May 9, 2024, ATF, LVMPD, and NLVPD personnel conducted a controlled

22   purchase operation involving CI#2, of a metal Glock switch MCD, a Palmetto State Armory

23   Glock-pattern pistol bearing serial number RC006411, a PMF Fabrique Nationale (FN)-pattern

24   pistol, and a PMF ArmaLite (AR)-pattern rifle from HOLLIS.

14

30.     Anticipating the planned meeting between CI#2 and HOLLIS, plainclothes law enforcement in unmarked vehicles established surveillance around SUBJECT RESIDENCE on May 9, 2024. SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 were both parked near SUBJECT RESIDENCE. Law enforcement watched HOLLIS come out of the residence, unload what appeared to be a black Pelican-type hard roller case, often used to store and transport firearms, from SUBJECT VEHICLE 2 and load it into SUBJECT VEHICLE 1. Surveillance units followed HOLLIS as he left SUBJECT RESIDENCE in SUBJECT VEHICLE 1. Surveillance units followed HOLLIS to Life Storage, located at 9712 West Maule Avenue,[3] Las Vegas, Nevada, 89148, briefly loosing visual contact with HOLLIS twice along the way. Law enforcement watched HOLLIS access unit 1016 at Life Storage, hereinafter referenced as "SUBJECT STORAGE UNIT."

31.     HOLLIS, using TT, continued to exchange text messages and phone calls with CI#2, who was using a monitored and recorded cell phone provided by ATF. HOLLIS directed CI#2 to Life Storage, located at 9712 West Maule Avenue, Las Vegas, Nevada 89148, and further directed CI#2 to meet him at storage unit 1016, SUBJECT STORAGE UNIT. HOLLIS told CI#2 that he "does his business," or words to that effect, at SUBJECT STORAGE UNIT. HOLLIS provided CI#2 with a gate code specific to SUBJECT STORAGE UNIT that Life Storage property management had provided to HOLLIS. HOLLIS met CI#2 in person at SUBJECT STORAGE UNIT. HOLLIS sold a metal Glock switch MCD, a Palmetto State Armory Glock-pattern semiautomatic pistol bearing serial number RC006411, a PMF Fabrique

---

[3] The Electronic Record of Contracts obtained from Life Storage management indicates the address of SUBJECT STORAGE UNIT is 9712 West Maule Avenue, Las Vegas, Nevada, 89148. According to the Clark County Tax Assessor online records, the address of the SUBJECT STORAGE UNIT is both 9712 and 9722 West Maule Avenue, Las Vegas, Nevada, 89148. Accordingly, the SUBJECT STORAGE UNIT incorporates both addresses.

Nationale (FN)-pattern semiautomatic pistol, and a PMF Armalite (AR)-pattern semiautomatic rifle to CI#2. CI#2 paid HOLLIS a total of $2800 in previously recorded U.S. currency, $500 for the metal Glock switch MCD, $650 for the Palmetto State Armory Glock-pattern pistol bearing serial number RC006411, $750 for the PMF FN-pattern pistol, and $900 for the PMF AR-pattern rifle. CI#2 asked HOLLIS how to install the MCD onto the Glock-pattern pistol. HOLLIS installed the Glock switch MCD onto the Glock-pattern pistol while explaining the installation process to CI#2, converting the Glock-pattern pistol into a machine gun.

32.     HOLLIS also showed CI#2 what appeared to be a Sten gun, a World War II-era 9x19mm selective fire short-barrel rifle, capable of functioning as a semiautomatic rifle or fully automatic machine gun. HOLLIS told CI#2 that he paid $5000 for the Sten. CI#2 observed there was an additive manufacturing (AM) machine, commonly referred to as a 3D printer, within SUBJECT STORAGE UNIT. AM machines are tools commonly used to create models, components, parts and/or complete devices with a variety of printing media. AM machines are commonly used to manufacture some types of MCDs, including Glock switches.

33.     During their May 9, 2024, meeting, CI#2 asked HOLLIS whether he could acquire controlled substances. HOLLIS told CI#2 that he could make some phone calls. CI#2 departed SUBJECT STORAGE UNIT with the firearms and MCDs.

34.     On or about May 10, 2024, HOLLIS, using TT, told CI#2, who was using a monitored and recorded cell phone provided by ATF, that he had contacted a person who would sell controlled substances, specifically methamphetamine, to CI#2.

35.     Law enforcement personnel requested information on any Life Storage storage units leased by HOLLIS. The business provided a lease application and agreement for SUBJECT STORAGE UNIT entered into by HOLLIS on February 26, 2024.

36.     Between May 9 and May 13, 2024, HOLLIS, using TT, continued to exchange text messages and phone calls with CI#2, who was using a monitored and recorded cell phone provided by ATF. During a recorded phone call, HOLLIS informed CI#2 that HOLLIS had an individual that would sell "glass" for $175 per ounce. Your Complainant recognizes "glass" to be a vernacular term used to describe methamphetamine, a controlled substance. HOLLIS told CI#2 the individual would sell a pound of "glass" for $1450. HOLLIS and CI#2 agreed to meet at SUBJECT STORAGE UNIT on May 13, 2024, for the controlled substances transaction.

**d.  May 13, 2024, Controlled Purchase of One Pound of Methamphetamine**

37.     On May 13, 2024, ATF, Drug Enforcement Agency (DEA), LVMPD, and NLVPD personnel conducted a controlled purchase operation involving CI#2 and an ATF Undercover Agent, hereinafter referenced as the ATF UC, of one pound of suspected methamphetamine from HOLLIS.

38.     When law enforcement surveillance units set up around SUBJECT STORAGE UNIT prior to the scheduled time of the controlled buy, HOLLIS was already present inside the SUBJECT STORAGE UNIT. When CI#2 and the ATF UC arrived to meet HOLLIS at SUBJECT STORAGE UNIT, the ATF UC saw a firearm inside an open gun safe in SUBJECT STORAGE UNIT. The ATF UC asked HOLLIS about the firearm. HOLLIS removed the firearm from the safe and handed it to the ATF UC. The firearm appeared to be a Sten gun, a 9x19mm selective fire short-barrel rifle, likely the same Sten gun HOLLIS showed CI#2 during the previous meeting. This time, however, HOLLIS claimed the Sten had belonged to HOLLIS' grandfather. The ATF UC function-tested the firearm, determining that it was capable of functioning as a fully automatic machine gun. The ATF UC returned the Sten to HOLLIS, who placed it back in the safe inside SUBJECT STORAGE UNIT. HOLLIS discussed firearms, manufacturing firearms, and manufacturing MCDs with the ATF UC.

1    HOLLIS told the ATF UC that HOLLIS 3D-prints MCDs two at a time with a 3D printer at

2    HOLLIS' residence. HOLLIS told the ATF UC that his residence "is just down the street," or

3    words to that effect.

4          39.    Your Complainant notes that Google Maps measures the shortest direct route

5    between SUBJECT RESIDENCE and SUBJECT STORAGE UNIT to be approximately 2.8

6    miles or 6 minutes of travel time.

7          40.    In the presence of CI#2 and the ATF UC, HOLLIS opened a toolbox inside

8    SUBJECT STORAGE UNIT and retrieved a clear bag containing a large amount of

9    translucent white crystalized substance. The ATF UC noted the material to be similar in

10   appearance and packaging as methamphetamine. The ATF UC counted out $1450 in

11   previously recorded U.S. currency and gave the funds to HOLLIS. HOLLIS explained

12   HOLLIS and an unidentified person whom HOLLIS described as his associate had to go to

13   another individual to acquire the purported methamphetamine the night before.

14         41.    HOLLIS also discussed manufacture of fraudulent documents, particularly

15   fraudulent identification and credit cards, showing the ATF UC and CI#2 examples of high-

16   quality forgeries HOLLIS said that he had produced. HOLLIS described using the fraudulent

17   identification documents and credit cards in various criminal schemes. Fraudulent

18   identification and credit cards used in criminal schemes generally fall within the definition of

19   unauthorized or counterfeit access devices under 18 U.S.C. § 1029.

20         42.    The ATF UC, accompanied by CI#2, departed SUBJECT STORAGE UNIT

21   with the suspected methamphetamine. At the conclusion of the controlled buy, the ATF UC

22   transferred the suspected methamphetamine to DEA personnel who field tested the substance.

23   The substance presumptively tested positive for methamphetamine. The suspected

24

18

1   methamphetamine weighed 466.3 grams, slightly more than one pound. The DEA sent the

2   suspected methamphetamine to the lab for further testing.

3       43.    From May 14, 2024, to the present, HOLLIS, using TT, has maintained recorded

4   communications with the ATF UC regarding the manufacture of additional firearms, machine

5   guns and MCDs, the manufacture and use of fraudulent documents, and obtaining controlled

6   substances, including both methamphetamine and "blues," which your Complainant

7   recognizes to be a vernacular term used to describe fentanyl, a controlled substance.

8                               **e.**
     **May 16, 2024, Surveillance of HOLLIS at SUBJECT RESIDENCE and SUBJECT**

9             **STORAGE UNIT and Observation of Possible Firearm**

10      44.    On May 16, 2024, law enforcement established surveillance around SUBJECT

11  RESIDENCE. Your Complainant observed HOLLIS emerge from SUBJECT RESIDENCE

12  and enter SUBJECT VEHICLE 1. Surveillance units followed HOLLIS in a covert capacity.

13  Your Complainant saw HOLLIS arrive at SUBJECT STORAGE UNIT without making any

14  stops or deviations between SUBJECT RESIDENCE and SUBJECT STORAGE UNIT.

15  HOLLIS entered SUBJECT STORAGE UNIT. Surveillance units watched HOLLIS place

16  what appeared to be a firearm into a bag while HOLLIS was inside the SUBJECT STORAGE

17  UNIT. HOLLIS exited SUBJECT STORAGE UNIT, secured SUBJECT STORAGE UNIT,

18  and departed in SUBJECT VEHICLE 1. Surveillance units again followed HOLLIS in a covert

19  capacity to a location believed to be HOLLIS' place of employment. Your Complainant noted

20  HOLLIS did not meet with anyone between SUBJECT STORAGE UNIT and his believed

21  place of employment.

22      45.    On or about May 20, 2024, HOLLIS, using TT, told the ATF UC that he had

23  three AR-pattern drop-in MCDs to sell to the ATF UC. A drop-in MCD, sometimes referred to

24  as a Drop-In Auto Sear (DIAS), causes a semiautomatic AR-pattern firearm to function as a

fully automatic machine gun by releasing the hammer each time the bolt cycles. With a drop-in MCD installed, an AR-pattern firearm will fire continuously until the shooter releases the trigger or all ammunition in the firearm is expended.

**f. May 24, 2024, Controlled Purchase of Three AR-Pattern Drop-In MCDs**

46.     On May 24, 2024, ATF, DEA, and LVMPD personnel conducted a controlled purchase operation involving the ATF UC of three AR-pattern drop-in MCDs from HOLLIS.

47.     Anticipating the planned meeting between the ATF UC and HOLLIS, plainclothes law enforcement in unmarked vehicles established surveillance around SUBJECT RESIDENCE and SUBJECT STORAGE UNIT the morning of May 24, 2024. Initially, neither SUBJECT VEHICLE 1 nor SUBJECT VEHICLE 2 were seen near SUBJECT RESIDENCE or SUBJECT STORAGE UNIT.

48.     Later that same morning, the ATF UC contacted HOLLIS on TT. HOLLIS told the ATF UC that he needed to "re-print" the AR-pattern drop-in MCDs. The ATF UC and HOLLIS agreed to meet later that day at the SUBJECT STORAGE UNIT for the sale and purchase of the MCDs.

49.     Approximately one hour after HOLLIS and the ATF UC spoke, surveillance personnel saw SUBJECT VEHICLE 1 arrive at SUBJECT RESIDENCE. Surveillance personnel watched HOLLIS get out of SUBJECT VEHICLE 1, approach the front door of SUBJECT RESIDENCE, produce a key from his person and used the key to unlock and open the front door of SUBJECT RESIDENCE, and enter SUBJECT RESIDENCE. Soon after, surveillance personnel saw HOLLIS emerge from SUBJECT RESIDENCE, open and get into SUBJECT VEHICLE 1, and drive SUBJECT VEHICLE 1 away from SUBJECT RESIDENCE. Surveillance teams followed HOLLIS in a covert manner to a fast-food restaurant, where they saw HOLLIS buy food at the drive-through, then travel back to

SUBJECT RESIDENCE. Surveillance personnel again watched HOLLIS get out of SUBJECT VEHICLE 1, approach the front door of SUBJECT RESIDENCE, open the front door of SUBJECT RESIDENCE, and enter SUBJECT RESIDENCE.

50.    Approximately fifteen minutes later, surveillance personnel saw HOLLIS emerge from SUBJECT RESIDENCE, open and get into SUBJECT VEHICLE 1, and travel to SUBJECT STORAGE UNIT where the ATF UC was waiting. Law enforcement personnel also identified HOLLIS at the SUBJECT STORAGE UNIT via the management video surveillance system.

51.    In the presence of the ATF UC, HOLLIS produced a key from his person and used the key to unlock and open SUBJECT STORAGE UNIT. HOLLIS and ATF UC entered into SUBJECT STORAGE UNIT. Inside SUBJECT STORAGE UNIT, HOLLIS handed the ATF UC a Zyn nicotine pouch canister containing three AR-pattern drop-in style MCDs. The ATF UC paid HOLLIS $300 in previously recorded U.S. currency for the three AR-pattern drop-in style MCDs. HOLLIS discussed manufacturing other firearms and firearm parts with the ATF UC.

52.    HOLLIS also discussed manufacture of fraudulent documents, particularly fraudulent identification, showing the ATF UC an example of a high-quality forgery of an identification document HOLLIS said that he had produced, bearing HOLLIS' image with a different name and identifying data. HOLLIS handed the document to the ATF UC to examine. HOLLIS described how he manufactures fraudulent identification, and how those fraudulent identification documents can be used to steal vehicles from rental car companies.

53.    HOLLIS closed and secured SUBJECT STORAGE UNIT. The ATF UC departed. Surveillance personnel watched HOLLIS open and get into SUBJECT VEHICLE 1, then drive away from SUBJECT STORAGE UNIT. Surveillance teams, following HOLLIS in

a covert manner, saw HOLLIS meet with an unknown male in the vicinity of SUBJECT

STORAGE UNIT. Surveillance teams watched HOLLIS park and get out of SUBJECT

VEHICLE 1 and enter a vehicle driven by the unknown male. Surveillance teams covertly

followed HOLLIS and the unknown male as they drove around the neighborhood for several

minutes. HOLLIS and the unknown male then stopped at a gas station. Neither HOLLIS nor

the unknown male exited the vehicle. After several minutes, HOLLIS and the unknown male

drove back to where HOLLIS had parked SUBJECT VEHICLE 1, covertly followed by

surveillance teams. Surveillance personnel watched HOLLIS get out of the vehicle driven by

the unknown male, then open and enter SUBJECT VEHICLE 1. Surveillance teams followed

SUBJECT VEHICLE 1 and the vehicle driven by the unknown male until both arrived at

SUBJECT RESIDENCE. Surveillance personnel watched both HOLLIS and the unknown

male enter SUBJECT RESIDENCE. A short time later, surveillance was terminated.

54.     An ATF Firearms Enforcement Officer (FEO) conducted a preliminary visual

inspection of the 10 machine guns HOLLIS trafficked during the course of this investigation.

The ATF FEO opined that each of the 10, that is: the Glock switch MCD HOLLIS transferred

to CI#1 on May 1, 2024; the five 3D-printed Glock switch MCDs HOLLIS sold to CI#2 on

May 8, 2024; the Palmetto State Armory Glock-pattern pistol with attached metal Glock switch

MCD HOLLIS sold to CI#2 on May 9, 2024; and the three drop-in AR-pattern MCDs

HOLLIS sold to the ATF UC on May 24, 2024, is properly classified as a machine gun, that is,

either a "weapon which shoots, is designed to shoot, or can be readily restored to shoot,

automatically more than one shot, without manual reloading, by a single function of the

trigger," 26 U.S.C. § 5845(b), or a "part designed and intended solely and exclusively, or

combination of parts designed and intended, for use in converting a weapon into a

machinegun," *id*.

### g. June 21, 2024, Arrest and Execution of Search Warrants

55.    On June 20, 2024, Sgt Price (LVMPD) established phone contact with HOLLIS. HOLLIS agreed to meet with Sgt Price on June 21, 2024 under the guise that HOLLIS would be meeting to collect a firearm belonging to him that was currently in LVMPD custody. During this phone call HOLLIS mentioned he was preparing to travel to Florida for some time.

56.    On June 21, 2024, agents with ATF and officers with LVMPD and NLVPD established surveillance around 9794 Villa Lorena. Surveillance observed HOLLIS exit the residence and enter the red Mitsubishi Mirage, now bearing a license plate of NV 881 6AZ, and depart from the residence. Surveillance followed HOLLIS and the vehicle until marked LVMPD units conducted a traffic stop on the vehicle in the area of Summit Club Drive and Town Center Drive. HOLLIS was taken into federal custody and has remained in continuous custody since that time. Search warrants executed on SUBJECT STORAGE UNIT and SUBJECT RESIDENCE failed to locate the Sten gun machine gun HOLLIS showed to CI#2 on May 9, 2024, and which the ATF UC function-tested on May 13, 2024. Among other evidence, law enforcement personnel located and seized a total of four 3D printers from the SUBJECT STORAGE UNIT and SUBJECT RESIDENCE.

1                                    CONCLUSION

2          57.    Based upon the information set forth in this application, your Complainant

3    respectfully submits that there is probable cause to believe that Anthony George Hollis, a.k.a.

4    "Ant," violated 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D), Manufacturing and

5    Dealing in Firearms Without a License; 18 U.S.C. § 922(o), Illegal Possession and Transfer of

6    Machine Guns, and  21 U.S.C. §§ 841(a)(1) and (b)(1)(B), Possession of a Controlled

7    Substance with Intent to Distribute (Methamphetamine), Between on or about May 1, 2024

8    and May 24, 2024, as described above.

9

10

11                                         Robert Raybould, Special Agent
                                           Bureau of Alcohol, Tobacco, Firearms, and
12                                         Explosives (ATF)

13   Sworn and subscribed before me on this 24th day of June, 2024.

14

15   _____
     HONORABLE MAXIMILIANO D. COUVILLIER, III
16   UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

24